Albert F. Saunders v. Commissioner.
Saunders v. Commissioner
Docket No. 90363.
United States Tax Court
T.C. Memo 1964-211; 1964 Tax Ct. Memo LEXIS 127; 23 T.C.M. (CCH) 1267; T.C.M. (RIA) 64211; August 6, 1964
*127 Certain items claimed as interest deductions for 1956, 1957, and 1958 disallowed on the ground that as payments of interest, the transactions were shams. Joseph H. Bridges, 39 T.C. 1064, affd. 325 F. 2d 180, Eli D. Goodstein, 30 T.C. 1178, affd. 267 F. 2d 127, and like cases, followed. Additional travel and entertainment expenses allowed for 1958. Respondent's determination as to automobile expense and automobile depreciation sustained for lack of proof that any error was committed. Rollin Browne and Cecil Browne, 30 Broad St., New York, N. Y., for the petitioner. Joseph M. Touhill and William T. Holloran, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income *128 tax for the calendar years 1956, 1957, and 1958 in the amounts of $38,307.86, $50,595.69, and $4,583.33, respectively. The principal issues are whether the respondent erred in disallowing certain deductions claimed by petitioner in his returns for the years 1956, 1957, and 1958 in amounts and for items as follows: Item
1956
1957
1958
Interest paid
$49,500.00
$62,651.19
$3,750.00
Travel and entertainment
1,550.00
1,550.00
2,750.00
Automobile expense
243.60
400.01
283.00
Automobile depreciation
958.41
460.38
245.51
Alternative errors were alleged. Findings of Fact Some of the facts were stipulated and are incorporated herein by reference. Petitioner is an individual presently residing in New York City, N. Y. He filed his Federal income tax returns for the years 1956, 1957, and 1958 with the director of internal revenue at Detroit, Mich. During those years petitioner was a manufacturers' agent and resided in Detroit. Petitioner retired from business on or about December 31, 1961, and no longer maintains an office. For the taxable years involved petitioner reported "adjusted gross income" and "taxable income" in amounts as follows: Adjusted
Taxable
Year
Gross Income
Income
1956
$ 87,197.59
$29,307.63
1957
130,194.84
54,415.17
1958
52,230.05
33,630.49
*129 Petitioner kept his books and filed his returns for the years involved on the calendar year basis and on the cash receipts and disbursements method of accounting. $600,000 Transaction On December 7, 1956, Garvin, Bantel & Co. (hereinafter sometimes called broker), stock and bond brokers and dealers and loan brokers, and members of the New York and American Stock Exchanges with offices in New York City, in form confirmed a purchase from the Bank of the Commonwealth, Detroit, Mich., of $600,000 U.S. Treasury bonds, 2 1/2 percent, due November 15, 1961, for the net amount of $601,118.78 consisting of $600,000 principal, plus accrued interest of $1,118.78. On the same date, broker in form confirmed a sale to petitioner of these bonds at a price of 94 16/32, or $567,000, plus accrued interest of $1,118.78. On both of these confirmations the settlement date was given as December 12, 1956. Also, on December 7, 1956, broker wrote petitioner, enclosing four papers: (1) confirmation of purchase at 94 16/32, (2) $600,000 note on Bank of the Commonwealth, (3) pledge of collateral form, and (4) letter of instructions to the bank, and stating: It will be necessary for you to sign and return *130 to us all the above papers together with your interest check, drawn to the order of the bank, in the amount of $48,381.22. This amount, together with the interest of $1,118.78 shown on the confirmation, will be the amount of your interest deduction. We will appreciate your immediate attention as settlement date is December 12, at which time we will mail you our check in the amount of $31,881.22. The $31,881.22 represented the difference between the so-called purchase price of $568,118.78 and the amount of the note for $600,000. On December 12, 1956, petitioner in form executed a promissory note payable to the Bank of the Commonwealth for $600,000, due November 15, 1961 (same due date as the bonds). Indorsed on the back of the note was "Dec. 12, 1956 Pd $48,381.22 Interest." On December 12, 1956, petitioner in form executed a "Pledge of Collateral" pledging the $600,000 of bonds to be held by the bank as collateral security to the note for $600,000. On December 12, 1956, petitioner in form wrote the Bank of the Commonwealth a letter stating: On December 12, 1956 will you kindly receive from Garvin, Bantel & Co., or their order, at the First National City Bank of N. Y. *131 , 600M U.S. Treasury 2 1/2% 11/15/61 against payment for my account of $600,000.00. This letter will authorize you to detach the coupons as they come due and credit the proceeds as part payment of interest due. This letter will further serve as your authorization to purchase the above bonds at par flat, without refund of interest, at your option on or after June 27, 1957, the proceeds to be used to discharge my entire indebtedness to your bank. The above letter had been prepared by broker for petitioner's signature. The bid and asked prices for U.S. Treasury bonds, 2 1/2 percent, due November 15, 1961, with all unmatured interest coupons attached, exclusive of accrued interest, on the following dates, were: Date
Bid
Asked
December 7, 1956
94 10/32
94 14/32
June 27, 1957
94
94 4/32
On December 10, 1956, broker wrote petitioner "in connection with the loan we have negotiated for you" in the amount of $600,000 advising petitioner that: In our discussions with the bank they have advised that they do not expect to call for additional margin during the life of your loan. Please accept our assurances that such a call will not be made. The Bank of the Commonwealth *132 was one of the leading banks in Detroit. On December 10, 1956, George K. Garvin of broker wrote the comptroller of the Bank of the Commonwealth a letter, the body of which letter is as follows: We have enclosed herewith our confirmation of purchase of 600M U.S. Treasury 2 1/2% 11/15/61 at par. These bonds have been placed in a loan for the following maker: Mr. Albert F. Saunders, 700 Seward Avenue, Detroit, Mich.
We have had similar dealings with Mr. Saunders who is in the construction business and who gives us the Detroit Bank as a reference. The signed papers will be forwarded to you together with Mr. Saunder's check for $48,381.22 representing payment of interest to maturity. Of this amount $36,000. is due Garvin, Bantel & Co., leaving a figure net to the bank of $12,381.22. We are delighted that you ventured into this type of transaction and hope it proves so simple and profitable that it will be the forerunner of many more. On December 11, 1956, petitioner wrote broker that he was "sending you herewith the following papers to complete my transaction in the 600M U.S. Treasury 2 1/2's." The enclosed papers were: (1) the said promissory note for $600,000; (2) the said *133 signed pledge of collateral; (3) the abovementioned letter to the bank dated December 12, 1956; and (4) an interest check dated December 11, 1956, payable to the Bank of the Commonwealth for $48,381.22. On December 12, 1956, broker wrote petitioner a letter, the body of which was: You will find enclosed herewith our check to your order in the amount of $31,881.22 which will complete your transaction in the Treasury bonds. It has been a pleasure to be of service to you and should you need more of this type money I believe we will have more available for you or your friends. On December 11, 1956, the Bank of the Commonwealth advised the First National City Bank of New York that "Saunders [petitioner] will give you check for $48,381.22" and "Please pay $36,000 to Garvin, Bantel and Company, and credit our account $12,381.22 [$48,381.22 minus $36,000]." On December 13, 1956, the First National City Bank of New York sent a letter by registered mail to the Bank of the Commonwealth, the body of which letter is as follows: We have reference to your wire of December 11, and wish to advise that we have delivered $600,000 U.S.A. Treasury Bonds 2 1/2% due November 15, 1961 to Garvin *134 Bantel & Co., against payment of $601,118.78 which amount we have credited to your account. We have received from Garvin Bantel & Co., against payment of $600,000 the same securities and have deposited them in safekeeping for you Sub-Account Collateral Securities Block No. 1 Albert F. Saunders. We enclose our advices covering these transactions. We are also enclosing Promissory Note dated December 12, 1956 executed by Albert F. Saunders together with Pledge of Collateral and a letter addressed to you by Mr. Saunders. We have received from Mr. Saunders check in the amount of $48,381.22 and have paid Garvin Bantel & Co., $36,000. and have credited your account with the balance of $12,381.22. On May 15, 1957, the First National City Bank of New York credited the Bank of the Commonwealth with interest of $7,500 which was the interest for 6 months on $600,000 U.S. Treasury bonds 2 1/2 percent, due November 15, 1961. On June 27, 1957, the Bank of the Commonwealth exercised its option (mentioned in the letter from petitioner to the bank, dated December 12, 1956) and returned petitioner's note to him marked paid. On his return for 1956 petitioner deducted $49,500 as interest paid *135 in form to the Bank of the Commonwealth. The respondent disallowed the claimed deduction as "not allowable under the provisions of Section 163 or any other section of the Internal Revenue Code of 1954." On his return for 1957 petitioner reported a long-term capital gain of $33,000 on the alleged sale on June 27, 1957, for $600,000 of U.S. Treasury bonds acquired on December 7, 1956, at alleged cost of $567,000. The $600,000 transaction was not a bona fide transaction possessing commercial reality. As a payment of interest, the $600,000 transaction was a sham. The transaction was a mere fabrication of George K. Garvin for the purpose of creating an income tax deduction for petitioner. Garvin, Bantel & Co., acting through George K. Garvin, Sr., entered into transactions similar to the $600,000 transaction herein set forth with about six other individuals. One of those individuals was Joseph H. Bridges whose income tax case was litigated in Joseph H. Bridges, 39 T.C. 1064, affirmed 325 F. 2d 180 (C.A. 4, 1963). $500,000 Transaction On February 12, 1957, broker in form confirmed a purchase from the Bank of the Commonwealth of $500,000 U.S. Treasury *136 1 7/8 percent notes, due February 15, 1959, for the net amount of $500,000, no interest accrued. On the same date, broker in form confirmed a sale to petitioner of these notes at a price of 97 1/4 or $486,250. On both of these confirmations the settlement date was given as February 15, 1957. Also, on February 12, 1957, George K. Garvin of broker wrote petitioner, as follows: All the enclosed papers are necessary to your transaction in the Treasury 1 7/8's of 1959. We will appreciate your early attention to and return of same to our office. I certainly hope this will be a profitable deal for you, and with all good wishes, I remain On February 19, 1957, petitioner in form executed a promissory note payable to Bank of the Commonwealth for $500,000, due on February 15, 1959 (same due date as the U.S. Treasury notes). Indorsed on the back of the note was "Feb. 19, 1957 Pd $20,625 Int." On February 14, 1957, petitioner in form executed a "Pledge of Collateral" pledging the $500,000 of Treasury notes to be held by the bank as collateral security to the note for $500,000. On or about February 14, 1957, petitioner in form wrote the Bank of the Commonwealth a letter, stating: On *137 February 15, 1957, will you kindly receive from Garvin, Bantel & Co., 120 Broadway, New York 5, N. Y., or their order, $500,000.00 United States Treasury 1 7/8% notes due February 15, 1959 against payment for my account of $500,000.00. It is hereby agreed and understood that as the coupons on this collateral become due you will collect them and credit my account with you, and then charge my account and credit yourselves as part payment of interest. The balance of interest due you, namely $20,625.00 is enclosed herewith. On or after August 25, 1957 I hereby grant you the option to prepay my loan with you in the amount of $500,000.00 by purchasing the collateral for the face amount of my note without refund of interest. The above letter had been prepared by broker for petitioner's signature. On February 14, 1957, petitioner, in his own handwriting, addressed a letter to broker, saying: I am returning to you attached 1 My check covering interest payment 2 Note dated 2/15/57 3 Instruction letter to Bk of Commonwealth
4 Pledge of collateral 5 Delivery of Bonds letter Hope all is in order. The bid and asked prices for U.S. Treasury notes, 1 7/8 percent, due February 15, 1959, with *138 all unmatured interest coupons attached, exclusive of accrued interest, on the following dates, were: Date
Bid
Asked
February 12, 1957
97 8/32
97 10/32
August 26, 1957
97 2/32
97 5/32
On August 15, 1957, the First National City Bank of New York credited the Bank of the Commonwealth with interest of $4,687.50 which was the interest for 6 months on $500,000 U.S. Treasury notes 1 7/8 percent, due February 15, 1959. On February 18, 1957, the Bank of the Commonwealth wrote the First National City Bank of New York a letter, the body of which was as follows: This will confirm our telephone conversation of today. "We have sold to Garvin, Bantel & Company, $500,000 U.S. Treasury 1 7/8% notes due 2/15/59, for delivery 2/19/57 at par. These securities are being held by you for safekeeping for our account. Kindly place the proceeds to the credit of our account with you. We have made a loan to Albert F. Saunders in the amount of $500,000, the note for which is in our hands. The loan will be secured by the above securities or other of like interest rate and maturity. Please charge our account in this amount, making payment to Mr. Saunders. Kindly hold the securities *139 for our account in your collateral safekeeping department, forwarding us your receipt. Coupons from the notes as they mature should be clipped and placed to the credit of our account." On February 14, 1957, petitioner issued his personal check payable to the order of the Bank of the Commonwealth in the amount of $20,625 to cover the so-called interest on the above purported note for $500,000. On February 18, 1957, George K. Garvin of broker wrote petitioner saying: We have enclosed herewith our check to your order in the amount of $13,750.00 representing the difference between your loan and the cost of your bonds [bond]. We trust you will be pleased with this transaction and will look forward to hearing from you again if you have further tax "sheltering" worries. The $13,750 represented the difference between the so-called purchase price of the U.S. Treasury notes of $486,250 and the amount of the note for $500,000. On August 26, 1957, the Bank of the Commonwealth wrote petitioner, saying; "We confirm the purchase from you today at par flat, $500,000.00 United States Treasury 1 7/8 per cent Bonds [Bond] due February 15, 1959." On his return for 1957 petitioner claimed *140 deductions for interest allegedly paid to Bank of the Commonwealth in the total amount of $34,907.30 ($27,957.04, plus $6,950.26). The $6,950.26 [1] was coupon interest and included in the $27,957.04 was, coupon interest of $7,332.04. [1] The respondent disallowed the claimed deductions as "not allowable under the provisions of Section 163 or any other section of the Internal Revenue Code of 1954." On his return for 1957 petitioner reported a long-term capital gain of $13,750 on the alleged sale on August 26, 1957, for $500,000 of U.S. Treasury "Bonds" ["Bond"] acquired on February 15, 1957, at an alleged cost of $486,250. On his return for 1957 petitioner reported among income from interest three items of interest from "Gov't Bonds-Coupons" in the amounts of $1,875, $7,332.54, and $6,950.26, respectively. The $500,000 transaction was not a bona fide transaction possessing commercial reality. As a payment of interest, the $500,000 transaction *141 was a sham. The transaction was a mere fabrication of George K. Garvin for the purpose of creating an income tax deduction for petitioner. $250,000 Transaction On or about May 20, 1957, Corporate Finance Corporation, through its president, treasurer, and executive officer, Harry N. Cushing, purportedly sold $250,000 face amount U.S. Treasury notes, 1 1/2 percent, due October 1, 1961, to C. F. Childs and Company (hereafter sometimes called Childs) at 91 41/64, or $229,101.56, plus 51 days of interest of $522.54, or a total selling price of $229,624.10. That purported sale was made with provision for delayed delivery of the Treasury notes purportedly sold. On or about May 20, 1957, petitioner purportedly purchased from Childs $250,000 face amount U.S. Treasury notes, 1 1/2 percent, due October 1, 1961, at 91 22/32, or $229,218.75, plus 51 days of interest of $522.54, or a total purchase price of $229,741.29, to be delivered against payment on May 22, 1957. Petitioner instructed Childs to deliver the aforesaid Treasury notes to the South Side Bank & Trust Company (hereafter sometimes called South Side Bank) against payment of $229,218.75. This instruction was prepared and made *142 pursuant to the instructions of Livingstone & Company. Petitioner was told by Livingstone & Company in the same advice to transmit to Livingstone & Company petitioner's check payable to Childs in the amount of $522.54, which check petitioner purportedly did transfer. The bid and asked prices for U.S. Treasury notes, 1 1/2 percent, due October 1, 1961, on May 22, 1957, were bid price 91 20/32 and asked price 91 28/32. On May 22, 1957, petitioner signed what was purported to be a promissory note to South Side Bank, which purported promissory note had been transferred for signature to petitioner by Livingstone & Company with instructions to return the note to Livingstone & Company for transmission to South Side Bank. The same instruction from Livingstone & Company to petitioner directed petitioner to return to Livingstone & Company, with the said purported promissory note, petitioner's check in the amount of $21,836.70 payable to South Side Bank. The purported promissory note was a promise by petitioner to pay $229,218.75 to South Side Bank with interest at the rate of 3 7/8 percent per annum with maturity date of October 1, 1961. The purported note provided for total interest charges *143 in the amount of $38,711.70, of which $21,836.70 was to be prepaid and the remaining balance was to be paid by the application of coupon note interest by the obligee in satisfaction of promissory note interest at the rate of $3,750 per annum. The purported promissory note also contained a purported pledge of collateral to secure the obligation of the petitioner and this collateral was recited as being $250,000 U.S. Treasury 1 1/2 percent notes, due October 1, 1961. The holder of the note was given full power at any time, without notice to petitioner, to sell or buy the pledged collateral and apply the proceeds in satisfaction of petitioner's promissory obligation. On May 22, 1957, petitioner signed a purported nonnegotiable promissory note to the Court Finance and Loan Corporation in the face amount of $20,781.25 with interest at the rate of 3 7/8 percent per annum. The purported promissory note also gave Court Finance and Loan Corporation a lien on the $250,000 U.S. Treasury notes which had been purportedly pledged with South Side Bank, as explained above. The legal rights of Court Finance and Loan Corporation to the purported pledged collateral were specifically made subject to *144 the rights of South Side Bank. The purported promissory note provided for the prepayment of all the interest due on the note in the amount of $3,509.65 and petitioner purportedly paid that amount by personal check dated May 21, 1957. Petitioner's liability on his promissory note to Court Finance and Loan Corporation was limited to the proceeds which would result from the liquidation of the pledged collateral after the application of the proceeds of such liquidation to the satisfaction of petitioner's promissory note to South Side Bank. Pursuant to a prearrangement of Cushing on behalf of Corporate Finance Corporation, M. Eli Livingstone, and South Side Bank, petitioner's purported promissory note to South Side Bank was negotiated on or about May 20, 1957, by South Side Bank to Corporate Finance Corporation and the purported pledged collateral was purportedly delivered to Childs pursuant to the instructions of South Side Bank for the account of Corporate Finance Corporation. The said instruction of South Side Bank were contained in a letter dated May 28, 1957, to the Hanover Bank of New York City, the material part of which is as follows: This will confirm telephone request of May *145 22nd, 1957, to receive from C. F. Childs & Co., $250,000.00 U.S. Treasury 1 1/2% Notes due October 1, 1961 against payment of $229,218.75 and charge our account. We then request that you deliver to C. F. Childs & Co., for account of Corporate Finance Corporation the $250,000.00 U.S. Treasury 1 1/2% Notes due October 1, 1961 against payment of $229,218.75 and credit our account. In connection with the purchase of the aforesaid promissory note by Corporate Finance Corporation on or about May 20, 1957, South Side Bank was instructed by Corporate Finance Corporation to deliver the aforesaid U.S. Treasury notes to Childs at the Hanover Bank against payment of $229,218.15 and to deliver the promissory note to Corporate Finance Corporation. South Side Bank confirmed on May 28, 1957, the purchase of the promissory note on May 20, 1957, by Corporate Finance Corporation and transferred the promissory note itself to Corporate Finance Corporation. In accordance with that instruction, South Side Bank notified Corporate Finance Corporation that its checking account had been credited in the total amount of $21,137.69, constituting the purported prepaid interest of petitioner of $21,836.70, minus *146 service charges of $699.01. South Side Bank also notified Corporate Finance Corporation that the U.S. Treasury securities purportedly constituting the collateral securities had been delivered to Childs at the Hanover Bank for Corporate Finance Corporation against payment of $229,687.50. On his return for 1957 petitioner also claimed deductions for interest allegedly paid to South Side Bank of $24,234.24 (total of $21,836.70, $522.54 and coupon interest of $1,875) and to Court Finance and Loan Corporation of the $3,509.65. On his return for 1958 petitioner reported among income from interest one item of interest from "Gov't Bonds - Coupons" in the amount of $3,750 (one year's interest on $250,000 U.S. Treasury Notes, 1 1/2 percent, due October 1, 1961) and deducted a like amount as interest paid to South Side Bank. The respondent disallowed the claimed deductions as "not allowable under the provisions of Section 163 or any other section of the Internal Revenue Code of 1954." Petitioner's loans from Corporate Finance Corporation through the South Side Bank and from the Court Finance and Loan Corporation made and continued in effect during the years 1957 and 1958 in connection with *147 petitioner's transactions in 1 1/2 percent U.S. Treasury notes were fabrications and a sham totally lacking in commercial effect and constituted nothing more than paper transactions knowingly devised exclusively for the purpose of obtaining tax deductions for petitioner. Travel and Entertainment During each of the years 1956, 1957, and 1958, petitioner was engaged in business as a manufacturers' agent and, as such, was engaged primarily in the business of selling and promoting his principals' products. In his income tax returns for each of the years 1956, 1957, and 1958 petitioner claimed, on page 2 thereof, $2,750 as a deduction for "unreimbursed travel and entertainment." In his notice of deficiency herein, respondent allowed $1,200 of such expenses for 1956 and disallowed $1,550; allowed $1,200 for 1957, and disallowed $1,550; and disallowed the entire $2,750 claimed for 1958. In a statement attached to the deficiency notice the respondent explained his determination thus: The miscellaneous deductions of $2,750.00 claimed by you in your return for each of the years 1956, 1957 and 1958 for unreimbursed travel and entertainment expenses have been disallowed in the respective *148 amounts of $1,550.00, $1,550.00 and $2,750.00 because it has not been established that the full amounts claimed constitute ordinary and necessary business expenses or were expended for the purpose designated. In schedule C of his income tax returns for 1956, 1957, and 1958 petitioner also deducted as business promotion, selling, traveling and entertainment expenses the amounts of $1,478.36, $5,175.84 and $6,414.44, respectively. These amounts were allowed by the respondent. During 1956 and 1957 there was associated with petitioner a man named Shaver who paid for a part of the office expense. In 1958 Shaver had died and petitioner had to pay for the entire expense of the office. During 1958 petitioner incurred and paid as travel and entertainment expenses at least $1,200 in addition to the $6,414.44 deducted in schedule C. Automobile Expense and Automobile Depreciation Petitioner claimed as deductions on his income tax returns certain expenses for the operation of automobiles, i.e., $828.23 for 1956, $1,000.03 for 1957, and $849.02 for 1958. In his notice of deficiency herein the respondent disallowed such automobile expenses to the extent of $243.60 for 1956, $400.01 for 1957, *149 and $283 for 1958. On his income tax returns the petitioner also claimed deductions for depreciation on a 1956 Cadillac automobile in the amounts of $2,984.08 for 1956, $1,657.37 for 1957, and $544 for 1958, of which the respondent, in his notice of deficiency herein, disallowed $958.14 for 1956, $460.38 for 1957, and $245.51 for 1958. The depreciation deductions so claimed by the petitioner on his 1956 Cadillac were based by him on 90 percent of the cost of the automobile to the petitioner. Petitioner has failed to prove that he is entitled to any greater allowance for automobile expense and automobile depreciation than was allowed by the respondent. Opinion We will consider the $600,000 and $500,000 transactions together. These are the transactions that were arranged for petitioner by George K. Garvin of Garvin, Bantel & Co. referred to in our findings as "broker." Except for dates and amounts, petitioner admits in his brief that the $500,000 transaction was identical with the $600,000 transaction. These transactions involve the $49,500 of alleged interest disallowed by the respondent for 1956 and $34,907.30 of the $62,651.19 of alleged interest disallowed for 1957. These amounts *150 are itemized as follows: Year 1956
Petitioner's check dated December
11, 1956 payable to the order of The
Bank of the Commonwealth
$48,381.22
Interest accrued to December 7,
1956, on $600,000 U.S. Treasury
bonds
1,118.78
Total
$49,500.00
Year 1957
Petitioner's check dated February
14, 1957, payable to the order of
Bank of the Commonwealth
$20,625.00
Coupon interest on $500,000 U.S.
Treasury notes from February 15,
1957, to August 26, 1957
7,332.04 *
$27,957.04
Coupon interest on $600,000 U.S.
Treasury Bonds from May 15,
1957, to June 27, 1957
6,950.26 *
Total
$34,907.30
Petitioner was one of about six other individuals for whom Garvin, Bantel & Co. as broker entered into transactions similar, except for dates and amounts, to the $600,000 and $500,000 transactions here involved. The cast of characters involved are all substantially the same. One of those individuals was Joseph H. Bridges whose income tax case was litigated in Joseph H. Bridges, 39 T.C. 1064, affirmed 325 F. 2d 180 (C.A. 4, 1963). In that case we found as an ultimate fact that "as payments of interest, the *151 transactions were shams." On the basis of the record, we have made the same ultimate finding in this case. We can see no difference in principle between the facts in this case and those in Bridges. The facts in the instant case, as well as those in Bridges, are very similar with the exception of such immaterial differences as names, dates, and amounts, as the facts in a much longer line of decisions known as the so-called Livingstone cases, the two most recent ones being Dooley v. Commissioner, - F. 2d - (C.A. 7, June 5, 1964), affirming a Memorandum Opinion of this Court, and Bornstein v. Commissioner, - F. 2d - (C.A. 1, June 23, 1964), affirming a Memorandum Opinion of this Court. It would serve no useful purpose to discuss again the many arguments made in this type of case. Suffice it to say that in our opinion, and we so hold, petitioner is not entitled to any interest deductions in connection with the $600,000 and $500,000 transactions. Bridges v. Commissioner, supra. In the alternative, petitioner alleges that, if not entitled to the interest deduction, the respondent erred in leaving in income reported by petitioner for 1957 long-term capital gain of $33,000 on the $600,000 *152 transaction and $13,750 on the $500,000 transaction and two items of interest income from "Gov't Bonds - Coupons of $7,332.54 and $6,950.26." In his brief the respondent concedes that he so erred. Effect will be given to this concession under Rule 50. Also, in the alternative, petitioner alleges that if not entitled to the interest deduction the respondent "erred in computing taxable income for 1957, in not allowing the amounts of $16,500.00 and $6,875.00 as deductions for loss or expense." These amounts are known as the so-called "out-of-pocket expense." The $16,500 item is the difference between the alleged interest of $48,381.22 and the rebate of $31,881.22 on the $600,000 transaction. The $6,875 item is the difference between the alleged interest of $20,625 and the rebate of $13,750 on the $500,000 transaction. We hold that respondent committed no error in this respect. Morris R. DeWoskin, 35 T.C. 356, appeal to C.A. 7 dismissed; Lewis v. Commissioner, 328 F. 2d 634 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court; Malden Knitting Mills, 42 T.C. - No. 56, filed July 24, 1964. Cf. Jockmus v. United States, - F. 2d - (C.A. 2, July 8, 1964). *153 To allow such a deduction under another name would in effect be allowing a part of the alleged interest deduction we have held was not allowable. The $250,000 transaction was engineered by M. Eli Livingstone, the person responsible for the many so-called Livingstone cases referred to above. This transaction involves $27,743.89 of the $62,651.19 of alleged interest disallowed for 1957 and the $3,750 disallowed for 1958. These amounts are itemized as follows: Year 1957
Petitioner's check dated May 21, 1957,
payable to the order of South Side
Bank & Trust Co.
$21,836.70
Petitioner's check dated May 21, 1957,
payable to the order of C. F. Childs
& Co.
522.54
Coupon Interest
1,875.00
$24,234.24
Petitioner's check dated May 21, 1957,
payable to the order of Court Fi-
nance & Loan Corp.
3,509.65
Total
$27,743.89
Year 1958
Coupon Interest
$ 3,750.00
We find it impossible to distinguish in principle the facts in the long line of the so-called Livingstone cases beginning with Eli D. Goodstein, 30 T.C. 1178, affirmed 267 F. 2d 127 (C.A. 1, 1959). See particularly Bornstein v. Commissioner, supra. We hold that the above *154 items deducted by petitioner as alleged interest are not deductible. The instant case is distinguishable from L. Lee Stanton, 34 T.C. 1 (petitions for review dismissed on stipulation of the parties, C.A. 2, Jan. 16, 1961), strongly relied upon by petitioner in support of all of its claimed deductions for interest for the reasons given in Joseph H. Bridges, supra, at p. 1079. Petitioner reported as interest income the two items of coupon interest of $1,875 in 1957 and $3,750 in 1958 which, as shown above, it claimed as interest deductions in those years. In view of our holding that these items are not deductible as interest paid, the respondent concedes that they should be excluded from interest income in the recomputations under Rule 50. Travel and Entertainment Expenses During the years in question petitioner conducted a business as a manufacturers' agent under the sole proprietorship name of Saunders and Company and was primarily engaged in selling and promoting his principals' products throughout a territory having a radius of from 60 to 75 miles from his Detroit office. Such a business necessarily entails the incurrence of large expenses. In *155 each of the years 1956, 1957, and 1958 petitioner deducted as business promotion, selling, traveling and entertainment expenses in schedule C of his returns the amounts of $1,478.36, $5,175.84, and $6,414.44, respectively. Those amounts were taken from the books of the business and the respondent has raised no questions about them. In addition, in each of the years petitioner deducted $2,750 for "unreimbursed travel and entertainment expense" on page 2 of his return. Those amounts could not be verified from the books of the business and were simply petitioner's and his accountant's best estimates of the total amounts spent by him in each year for which he had no written record. In his determination the respondent in effect applied the Cohan rule ( Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930)), for the years 1956 and 1957 and allowed $1,200 in each of those years and disallowed $1,550 of the $2,750 claimed. In 1958 the respondent disallowed the entire $2,750 claimed. One possible explanation for respondent's determination is that in 1958 the expenses in schedule C were larger than they had been in 1956 and 1957. Petitioner explained this increase in 1958 at the *156 trial when he testified that in 1956 and 1957 he had been associated with Shaver who paid for part of the office expense, whereas in 1958 Shaver had died and petitioner had to pay for the entire expense of the office. We think petitioner has shown that for 1958 he expended for travel and entertainment a sum larger than that deducted and allowed in schedule C of his return. Applying the Cohan rule, supra, we find this amount to be $1,200, the same amount allowed by the respondent for the years 1956 and 1957. We sustain the respondent's determination as to this issue for the years 1956 and 1957. Automobile Expense and Depreciation The facts as to these issues are fully set forth in our findings. On the basis of those facts, we hold that petitioner has failed to prove that he is entitled to any greater allowance for automobile expense and automobile depreciation than was allowed by the respondent. Decision will be entered under Rule 50. Footnotes
1. Petitioner's Exhibit No. 132 shows the amounts of $6,950.26 and $7,332.04 to be erroneous. The correct amounts are $9,226.20 and $4,969.98, respectively, or a net overstatement of interest expense and interest income of $86.62.↩
*. See Footnote 1 in Findings.↩